United States District Court
Southern District of Texas
**ENTERED**
October 16, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DOLMAR LEGACY GP, LLC, | § | |
| *Plaintiff*, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:23-cv-01489 |
| | § | |
| PULICE CONSTRUCTION, INC, | § | |
| | § | |
| *Defendant*. | § | |

**ORDER**

Pending before this Court is Plaintiff Dolmar Legacy GP, LLC's ("Dolmar") Motion for Partial Summary Judgment, (Doc. No. 43), Plaintiff Pulice Construction, Inc.'s ("Pulice") Response, (Doc. No. 47), and Defendant's Reply. (Doc. No. 49). Pulice objects to Dolmar's summary judgment evidence, (Doc. No. 46), and Dolmar responds. (Doc. No. 48). Pulice raised an additional argument orally on October 6, 2026. Dolmar responded in opposition, (Doc. No. 75), and Pulice replied. (Doc. No. 76). Having reviewed these documents, the record, and the applicable law, the Court hereby **DENIES** Plaintiff's Motion for Partial Summary Judgment, (Doc. No. 43).

## I. BACKGROUND

This case arises out of a lease agreement ("Lease") between Dolmar and Pulice for a 3.5-acre tract of land along a portion of State Highway 288. Pulice, a construction company, leased the parcel as a lay-yard for their use in fulfilling its contract with the Brazoria County Toll Road Authority to build out Segment B of the highway. Dolmar and Pulice entered into the lease on August 2, 2017 for a term to run from August 1, 2017 to September 30, 2019, at a rate of $2,500.00 per month. At the time of the Lease, the tract of land was unimproved hay fields.

During the course of the lease term, Pulice, in connection with its project with the Brazoria County Toll Road Authority, made several improvements on the property. Pulice graded the property, laid concrete and asphalt milling, and installed modular offices and a septic system. (Doc. No. 47, at 3). Pursuant to the Lease, Pulice was obligated to obtain any required permitting before making any improvements to the property. (Doc. No. 43, Ex. A, §§ 7, 17). Pulice obtained an Alarm Permit from the Burglar Alarm Administration, an Electrical permit, and a Stormwater Construction General Permit. (Doc. No. 47, Ex. A-3). Despite obtaining these permits, Pulice contends that because the grading and asphalt milling was intended to be temporary, they were not required to obtain a permit for it. (Doc. No. 43, Ex. F, 14:20-15:13). Pulice bases its contention on statements made by an unidentified electrical inspector who told Pulice that no further permitting would be required for the "temporary" concrete slab they were installing. (*Id.*) Pulice did not obtain a permit for the slab, nor did it obtain permits for the grading and introduction of asphalt milling. Nevertheless, the City of Houston did not issue any citations or express any concerns regarding the permitting on the lot during Pulice's lease term.

When conducting a final walk-through of the property at the end of Pulice's lease term, Pulice contends it asked Dolmar's representative if they would like for Pulice to remove the improvements to the property.[1] Pulice understood its obligation under section 8 of the Lease only to return the premises in substantially the same condition as received—in other words, return it as an unimproved hay field. (Doc. No. 43, Ex. A, § 8). It contends it only left the grading and asphalt milling intact because a representative of Dolmar told Pulice to leave the grading and asphalt milling in place. Dolmar disputes this conversation and contends that the parties had agreed before

[1] The parties disagree as to whether this conversation actually happened and whether this alleged reference covered both the concrete slab and the asphalt milling and grading or only the concrete slab. The parties appear to be in agreement that the modular offices—and related improvements—were always intended to be removed.

signing the Lease that these improvements to the lot would be permanent in return for a rent reduction. (Doc. No. 45, Ex. D, ¶ 2). Based on this understanding, Dolmar expected these improvements to be permanent. Pulice disputes this contention. (Doc. No. 47, at 3). Dolmar maintains that during the term of the Lease, they were unaware that any of the improvements were not permitted as required. (Doc. No. 43, Ex. E, ¶ 3). At the end of 2020, the Pulice–Dolmar lease expired.[2] (Doc. No. 43, Ex. B).

Dolmar then leased the lot to Ansco & Associates, LLC ("Ansco") in June 2021 for the term of one year to be renewed at the end of each term until 2026. (Doc. No. 43, Ex. C). One year later, the City of Houston Code Enforcement began issuing citations to Ansco, alerting them that they were operating on the property illegally due to unpermitted improvements on the property. (Doc. No. 43, Ex. E, ¶ 5). The City thereafter threatened Ansco with daily fines. (*Id.*). This left Ansco looking to Dolmar for relief. They unsuccessfully attempted to resolve the issues for approximately one year before Ansco began threatening litigation against Dolmar. (*Id.*). Dolmar and Ansco negotiated a mutual release agreement whereby Dolmar would release Ansco from the lease and Ansco would release all claims against Dolmar. (Doc. No. 43, Ex. C).

Thereafter, the City of Houston informed Dolmar that it could not occupy, use, or sell the premises until the property was compliant. (Doc. No. 43, Ex. G, p. 10). The City also informed Dolmar that in order for the property to be compliant, Dolmar would be either required to remove all improvements or remedy the permit violations. (*Id.*). The former would require a removal of the grading and asphalt millings. The latter course of action required a more complicated fix. Dolmar chose the latter course of action. It engaged a survey company and project engineer to submit multiple rounds of plans for approval with the City of Houston. (Doc. No. 43, Ex. E, ¶ 9;

---

[2] The parties amended the original Lease on June 2, 2020 to continue for an additional 6 months to terminate on December 31, 2020. Doc. No. 43, Ex. B).

Ex. G). The plan that eventually obtained approval required Dolmar to construct a large pond and ditches to comply with the City's detention and stormwater control regulations. This process lasted approximately 2 years and cost Dolmar hundreds of thousands of dollars. (Doc. No. 43, Ex. E, ¶ 9). Pulice claims that part of the improvements did not need to be permitted because they were going to be temporary, and the problems only arose when Dolmar opted to make them permanent. It also contends that Dolmar failed to mitigate any damages it suffered by choosing the most expensive course of action to remedy the compliance issues.

Dolmar now contends that Pulice breached the Pulice-Dolmar Lease by failing to obtain the required permits before it improved the property as was required by sections 7 and 17 of the Lease. Pulice denies these allegations. Before instituting this suit, Dolmar did not notify Pulice of its alleged breach. Both parties have moved for summary judgment.

## II. LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all

reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## III. ANALYSIS

### 1. Summary Judgment Evidence

Pulice makes several objections to Dolmar's summary judgment evidence. The Court will consider each in turn.

First, Pulice objects to the following statement in Dolmar's Corporate Representative, Lucas Cowan's January Declaration: "Representatives of Dolmar also walked the property at the end of Pulice's lease and observed asphalt milling covering the vast majority of the 3.5-acre tract." (Doc. No. 43-5, Exhibit E, ¶ 3). Pulice objects under Federal Rules of Evidence 602 for lack of personal knowledge and 802 for hearsay. Fed. R. Evid. 602; 802.

Under Rule 602, a witness may testify to a matter if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. *Michael Kors, LLC, v. Hernandez Int'l, Inc.*, No. 4:14-cv-0844, 2016 WL 6306129, at *13 (S.D. Tex. Oct. 27, 2016) (*citing* Fed. R. Evid. 602). The personal knowledge requirement for summary judgment affidavits is satisfied when the court can reasonably infer personal knowledge from the affidavit itself and from the witness's role within the company. *Campbell Harrison & Dagley, L.L.P., v. PBL Multi-Strategy Fund, L.P.*, 744 Fed.Appx. 192, 198 (5th Cir. 2018). Conversely, where personal

knowledge of a witness is imputed merely from the fact that the corporation itself had personal knowledge of a matter (i.e. the witness was not involved at all in the matter), no such inference of personal knowledge may be found. *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 Fed. Appx. 899, 907-08 (5th Cir. 2010) (holding that a corporate representative was incompetent to testify to matters within the corporation's knowledge when he himself did not participate in the investigation).

First of all, Cowan states in the Declaration itself that he has personal knowledge. Second, the Court can infer from Cowan's familiarity with the property, position within Dolmar, and personal involvement with the regulatory enforcement action that he had sufficient personal knowledge. Moreover, Plaintiff asserts that this testimony is admissible as it is being offered to prove something other than its truth and is therefore not hearsay. To the extent that this statement is being offered for the fact that a different Dolmar representative observed asphalt milling covering the vast majority of the 3.5 acres during the final walkthrough at the end of Pulice's lease term, the defendant's objection is sustained.

Next, Pulice objects to Cowan's statement that "At the time, Dolmar had no reason to suspect that Pulice performed this work illegally and without obtaining the proper permitting from the City of Houston." Doc. No. 45, Ex. D, ¶ 3. They object for lack of personal knowledge and for improper lay witness testimony under Rules 701 and 702. Fed. R. Evid. 701-02. For the same reasons set out above, the Court overrules this objection.

Pulice specifically objects to the use of the terms "illegal" and "proper permitting" as they call for a legal conclusion. Lay witnesses may testify beyond percipient observation if they have sufficient knowledge to testify about a particular thing and that thing would help the trier of fact understand a material issue. *Michael Kors, LLC*, 2016 WL 6306129, at *13. It seems sufficiently

clear that Cowan assumed the improvements to be legal and lacking in accordance with proper permitting requirements until the City told Dolmar otherwise.

Pulice also objects to Cowan claiming to know what Dolmar "suspected" regarding the legality of Pulice's work. Again, the Court may infer that Cowan, as the corporate representative of Dolmar who was involved in the lease activity had sufficient knowledge of what the company knew at the time. These objections are overruled.

Third, Pulice objects to the following statement: "Obtaining the proper permitting required Dolmar to engage a survey company and a project engineer to submit multiple rounds of plans for approval by the City of Houston." (Doc. No. 43, Ex. E, ¶ 9). Pulice argues that this statement is directly contradictory to evidence in the summary judgment record, namely an email from the City to Dolmar representing that "[i]n order to be incompliance [Dolmar] must obtain sewer/demo permits, . . obtain electrical permits, . . remove paving and impervious cover to bring it back to dirt grading property." (Doc. No. 43, Ex. G, p. 10). Pulice objects based on Rule 401, 402, and 403 as lacking proper foundation, being misleading, and being contrary to the evidence. Fed. R. Evid. 401-403.

The Court does not find this evidence to be contrary to the evidence as the remainder of the email thread with the City makes clear. (Doc. No. 43, Ex. G). The email thread as a whole demonstrates that while Dolmar potentially could have removed the improvements and thereby bring the property into compliance, they could also maintain the improvements, permit them properly, and continue to use the land in a profitable manner. His statement clearly goes to the latter course of action.

Fourth, Pulice objects to the January 6 videos showing auguring of the asphalt milling on the property under Rules 802, 803(6) and 901. Fed. R. Evid. 802; 803(6); 901. Dolmar argues that

the videos are non-hearsay as they are not statements intended to assert anything and instead merely depict the conditions on the property on January 6. The videos depict an augur drilling into asphalt on the property. It then depicts Cowan and a colleague digging in the sediment left behind to demonstrate the state of the ground on the lot. The two men may also be heard commenting about the depth of the auguring and the nature of the sediment as they dig with their hands. Dolmar states that the video may be admitted without the accompanying audio recording. Generally, a video is not considered to be hearsay as it is not an out-of-court statement that may be taken as true of false but rather is a demonstrative of the depicted event, state, or condition. While the statements of the men captured in the video would be hearsay unless there is an applicable exception, the video itself is not.[3] The Court will not consider the hearsay statements of the individuals in the videos.

Cowan states by way of authentication that he was physically present when the videos were taken[4] and attested to the condition of the property before and after they drilled the two holes.[5] Pulice's objections to the January 6 videos with audio removed are overruled.

Finally, Pulice objects to the use of Google satellite imaging of the property on the day that the improvements were made as lacking personal knowledge, improper hearsay, and for insufficient authentication. The Fifth Circuit has long held in the 6th Amendment Confrontation Clause context that computer generated content is not an assertion for the purposes of hearsay as

---

[3] There is, admittedly, very little case law regarding whether or not a soundless video is hearsay. Where the admissibility of videos has been discussed, it has been generally with regard to the statements made therein while the video, like photographs, were not found to be hearsay. *See Blair v. City of Dallas, Texas*, No. 3:14-cv-01515-P, 2015 WL 12940189, at *6 (N.D. Tex. July 2, 2015). Of some importance, however, is the fact that the Court does not find the video to be compelling evidence on any disputed issue of fact in this motion.

[4] "On Tuesday, January 6, 2026, I walked the Property again and using a hydraulically powered augur, assisted a colleague in penetrating the impervious asphalt milling on both sides of the Property. (*See* Exhibit 1; Exhibit 2)." (Doc. No. 43, Ex. E, ¶ 10).

[5] "Other than the asphalt milling requiring removal required [sic] to accommodate drainage plans finally approved by the City of Houston, these two augur holes are the only changes to the impervious cover laid by Pulice that have been made to the Property since Pulice laid it down in 2017." (Doc. No. 43, Ex. E, ¶ 10).

machine statements cannot constitute an out of court declaration. *See, e.g.*, *United States v. Waguespack*, 935 F.3d 322, 332-33 (5th Cir. 2019).

Pulice further argues that the photo is offered without any authenticating information from Google's custodian of records. Lastly, they argue that Cowan cannot authenticate the photo because he himself was admittedly not present on the day that the photo was taken and the paving activity took place. Therefore, Pulice argues, Cowan cannot say whether it is a fair and accurate depiction of the lot at the relevant time. Cowan can, however, testify to his observations of the lot before, during, and after Pulice's tenancy. (Doc. No. 43, Ex. E). Cowan states that he "[has] personal knowledge of the location of the Property, the adjacent land, and [the Google Earth image] represents a true and accurate depiction of the Property." (*Id.* at ¶ 3). Nevertheless, as with the videos, the Court finds that this photo has little evidentiary value on any contested issue raised in this motion.

**2. Breach of Contract**

Dolmar requests this Court to find, as a matter of law, that Pulice breached the Lease specifically when it graded and laid impervious cover without first obtaining a permit. (Doc. No. 43). In response, Pulice argues that, due to an applicable exemption in the building code and because the improvements were always intended to be temporary, they were not required to obtain permits at the time they were implemented. (Doc. No. 47). Pulice argues that if they had been permitted to remove the improvements at the end of the lease term as they intended, the present action would have been entirely avoided.

It is well-established Texas law that "[t]he elements of a breach-of-contract action are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of contract by the defendant, and (4) damages sustained by the plaintiff as a result of the

breach." *Tamasy v. Lone Star College Sys.*, 635 S.W.3d 702, 708 (Tex. App.—Houston [14th] 2021, no pet.). The Court addresses these elements, in turn, below.

*i. There is a valid contract between Dolmar and Pulice, and Dolmar performed under the contract.*

The parties do not dispute the existence of a valid contract nor that Dolmar fully performed its obligations under the Lease. The Court therefore turns to the question of whether a breach occurred.

*ii. Fact issues preclude summary judgment on the question of breach.*

Dolmar asserts that Pulice breached sections 7 and 17 of the Lease as a matter of law. Section 7 states:

> IMPROVEMENTS: Tenant may construct or modify the Premises (at Tenant's sole expense) as needed to conduct business. Tenant does not need to obtain Landlord's approval except for modifying any existing structures located on the Premises prior to Tenant's occupancy. **Tenant shall comply with all building, zoning and health codes and other applicable laws for said leased Premises and shall, in advance, obtain any and all construction permits as may be required.** Tenant is permitted to construct permanent structures and/or temporary structures and upon expiration of the Lease term, Tenant shall leave any or all improvements intact or Tenant shall be liable to remove such fixtures at Landlord's written request.

(Doc. No. 43, Ex. A, § 7) (emphasis added). Section 17 states:

> COMPLIANCE WITH LAWS, RULES AND REGULATIONS. Tenant shall comply with all laws, ordinances, orders, rules and regulations of state, federal municipal or other agencies or bodies having jurisdiction relating to the use, condition and occupancy of the Premises, including, without limitation, environmental laws, and shall indemnify and hold harmless Landlord from any suits, claims, judgments and expenses, including attorneys' fees arising from Tenant's use or occupancy of the Premises.

(Doc. No. 43, Ex. A, § 17). Uncontroverted summary judgment evidence shows that Pulice graded the property, laid asphalt milling, and laid a concrete slab without obtaining permits to do so. (Doc. No. 43, Ex. F, at 14:20-15:3; 15:17-19; 105:12-17, 23-25). Therefore, if these improvements required permits, Pulice was in breach.

Dolmar contends that permits were required for these improvements. In support of this contention, Dolmar points the Court to the City of Houston Municipal Courts Department Administrative Violation code BD44 "Perform Grading Without First Obtaining a Permit" which codifies Section J103.1[6] of the International Building Code as adopted by the City of Houston.[7] City of Houston Municipal Administrative Code § J103.1, BB44. That section states that "no person shall do any grading without first having obtained a grading permit from a building official." *Id.* at § J103.1. Rodney Roglin, corporate representative for Pulice, testified both that Pulice graded the lot and that a permit was required to do so. (Doc. No. 43, Ex. F, 105:12-17, 23-25). Pulice contends, nevertheless, that a permit was not required as Section J103.2 provided an exemption that applied to the grading Pulice did. City of Houston Municipal Administrative Code § J103.2. That section states that a "grading permit shall not be required for . . . [g]rading in an isolated, self-contained area, provided that the public is not endangered and that such grading will not adversely affect adjoining properties." *Id.* Neither party provides the Court with a definitive statement from the City that the grading and cover laid on the property either fell within this exception or required a permit under code BD44.

Dolmar fails to provide a single citation, red tag, notice of violation, or testimony/affidavit from a city inspector in its summary judgment evidence and relies instead on an 8-month-long email thread with Dolmar, Ansco, and the City discussing the unpermitted improvements and the citations that Dolmar and Ansco were facing (or already receiving) as a result. (Doc. No. 43, Ex. G). Particularly, Dolmar points to an email from the City to Dolmar from January 26, 2023, stating,

---

[6] The City of Houston Municipal Courts Department Administrative Violation Codes lists IBC E103.1 as the applicable provision. According to ICC Digital Codes, 2021 International Business Code permitting requirements are codified in Appendix J. Int'l Building Code, Appx. J (2022).

[7] The Court takes judicial notice that the City of Houston incorporates and adopts the International Building Code pursuant to Federal Rule of Evidence 201.

"[to] be incompliance, [sic] you must obtain sewer/demo permits to disconnect all [p]lumbing, obtain electrical permits disconnect [e]lectricity, remove paving and impervious cover to bring it back to dirt grading property." (*Id.* at 10).[8] Dolmar offers this email thread as circumstantial proof that the City would have required Pulice to obtain permits when they graded and laid asphalt milling in 2019. This email thread shows that the City cited the property as non-compliant by reason of these improvements in 2022 and required their removal. The Court cannot conclude as a matter of law from that fact that Pulice was required to obtain permits before making such improvements in 2019.

Pulice, in support of its contention that the improvements did not require a permit, points to Roglin's deposition testimony regarding a conversation he had with an unidentified city electrical inspector:

> Q. Okay. And you agree that laying a concrete slab requires a permit?
> A. No.
> Q. Okay. What is the basis for that belief?
> A. When the City of Houston was out there inspecting the electrical and the underground, he asked what we were putting there so he could fill out his inspection notice[] and everything. I told him what we were doing on a temporary basis and he said that was fine for what we were doing in the yard…
> Q. Okay. And you said he came out there and told you what?
> A. We did not need—we did not need a permit for installing a temporary concrete slab.
> Q. And where did he tell you this?
> A. Standing in the yard where we was [sic] going to put the slab.

(*Id.* at 14:20-15:3; 15:17-23). To the extent that this conversation is being offered to prove that Pulice was not required to obtain a permit to lay the concrete slab on a temporary basis, it is clearly hearsay. Pulice additionally points to the uncontroverted summary judgment evidence showing

[8] The emails provided to the Court record begin on June 14, 2022 with an email from Ansco to Dolmar. In that email, Ansco states that the City required that it remedy issues with electrical and septic permitting and that the "crushed concrete that is all over the yard [to] be permitted." (*Id.* at 34). Ansco also notes that it has not done any work on the property. (*Id.*). On July 7, 2022, Ansco emailed Dolmar stating that the "City Inspector dropped by today and red tagged us again," and asked for a status report on remediation of the permitting issues. (*Id.* at 32).

that the City did not issue any citations or notices of non-compliance during the Lease term as evidence that they were not required to obtain permits. Dolmar asserts that whether the City did or did not issue citations or engage in enforcement actions against the property at the time does not alter the independent obligation of Pulice to comply with the Lease and applicable law. (Doc. No. 49, at 8).

Accordingly, fact issues exist that preclude summary judgment on the question of whether Pulice breached sections 7 and 17 of the Lease.

*iii. Pulice's defense of equitable estoppel*

Pulice asserts based on the doctrine of equitable estoppel that Dolmar should be estopped from taking their current position because it told Pulice to leave the improvements on site at the end of the lease term. Under Texas law, a claim of equitable estoppel requires: "(1) a false representation or concealment of material facts; (2) made with knowledge of the facts; (3) with the intention that it should be acted upon; (4) to a party without knowledge or means of obtaining knowledge; and (5) who detrimentally relies upon such representation." *PDT Holdings, Inc. v. City of Dallas*, 712 S.W.3d 597, 610-11 (Tex. 2025). "The burden of proving an estoppel and the essential elements thereof is on the party asserting it and the failure to prove any one or more of the elements is fatal." *Kramer v. Kastleman*, 508 S.W.3d 211, 217 (Tex. 2017) (referencing *Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 838 (Tex. 1968)).

Pulice argues that Dolmar should be estopped from claiming that Pulice breached the Lease as Pulice left the improvements only after a Dolmar representative asked them to do so.[9] Pulice argues that, had it known that Dolmar would sue Pulice for leaving the improvements, it would

[9] Pulice fails at this time to point to admissible, competent evidence that a Dolmar representative said this. Rodney Roglin—corporate representative for Pulice—could not remember who this individual was nor could he provide any corroborating or authenticating context to the statement. As it currently stands, it seems unlikely to satisfy the admission by opposing party exception from the hearsay rule. Fed. R. Evid. 801(d)(2).

have rejected the instruction and removed the asphalt milling and grading. (Doc. No. 44, at 7). Pulice further asserts that it always intended to remove the improvements pursuant to its obligations under section 8 of the Lease and had it been given the opportunity to remove them these problems would not have occurred. (*Id.*).

Dolmar strongly disputes the assertion that the improvements were always intended to be temporary. Dolmar argues that it was entitled to maintain any improvements made by Pulice at the termination of Pulice's lease. The Lease notes that Pulice was to use the property in connection with its construction of the "Brazoria County Toll Road's project SH288 Managed Lanes." (Doc. No. 44, Ex. A-1, § 6). Unless the property was improved pursuant to section 7 of the Lease by laying some sort of concrete or asphalt pad like the one in question, any equipment that Pulice brought onto the property would have sunk into the ground. Therefore, Dolmar argues that both parties understood that Pulice would necessarily make improvements to the property. Further, Dolmar argues that section 7 and the reduction in rent offered to Pulice under the Lease evidence a clear understanding that long-term improvements were intended to be part of bargain struck by the parties. Section 7 states that "Tenant shall leave any or all improvements intact or Tenant shall be liable to remove such fixtures at Landlord's written request." (*Id.* at § 7). Pulice paid Dolmar $2,500 per month under the Lease. (*Id.* at § 3). When the parties extended the Lease for another six months, Pulice paid Dolmar $15,000 per month. (Doc. No. 44, Ex. A-2, § 2).

Regardless of whether the improvements would be considered "non-compliant" under the City municipal code as long as they remained temporary, the damages that Dolmar is seeking undoubtedly would not have occurred but for this decision to leave the improvements in place. Pulice then detrimentally relied on Dolmar's statement that it should leave these improvements in

place to Dolmar's benefit, and the present suit resulted. Pulice therefore raises a prima facie case regarding their defense of equitable estoppel.

Dolmar supplies competent summary judgment evidence regarding its expectations that these improvements would be permanent under the Lease. Therefore, a reasonable jury could find that Dolmar did or did not make a false representation or concealment of material facts and that Pulice did or did not detrimentally rely on the statement. Pulice sufficiently raises a fact issue regarding the parties' intentions with regard to improvements both at the time of entering into the Lease Agreement and at the time that Pulice left the improvements on the property. This fact issue precludes summary judgment on the question of liability.

*iv. Pulice's defense that Ansco should be held responsible*

Pulice also asserts in defense that Dolmar looked initially to Ansco as the party responsible for remedying the permitting issue and thereby admitted that Ansco, not Pulice should be held responsible. Pulice directs the court to consider an email sent by Dolmar to Ansco reminding them of their obligations under the lease and reasserting that "permitting issues are a [t]enant's responsibility." (Doc. No. 47, Ex. D). Conveniently left out of Pulice's Exhibit D is the prior email sent by Ansco stating:

> Although there is a phrase in the lease about "as is," there is still the fact that we cannot obtain a legal/viable permit due to the existing infrastructure (i.e., electrical, plumbing, detainage) not being permitted previously, thus if we were to remain on the property, we are subject to fines and/or citations. We feel as if we are required to take some sort of action to prevent fines/citations forthcoming as the City Management has stated.

(Doc. 43, Ex. G, p. 1). In context, it is clear that Dolmar was not shifting responsibility from Ansco to Pulice. The cause of the city's involvement with the property (the unpermitted improvements) is not called into dispute by Dolmar's admonishment to its then-current tenant that they were still

obligated to comply with the terms of the lease. Although the parties interpret this email to mean two different things, that dispute is not material as explained above.

*v. Pulice's defense of failure to give notice and opportunity to cure*

Pulice contends that Dolmar is in breach of the Lease for failure to give Pulice written notice and opportunity to cure any perceived lease violation before instituting this suit in violation of section 13 of the Lease. That section states:

> Tenant shall be in default of this Lease if Tenant fails to fulfill any material Lease obligation or term by which Tenant is bound. Failure to pay rent, as provided in Section 3 is considered material for purposes of this Lease and the provisions of Section 3 shall govern the circumstances in which the Landlord may terminate this Lease for failure to pay rent. *Subject to governing law to the contrary, if Tenant fails to cure any financial obligation within fifteen (15) days (or any other obligation to Landlord within twenty days) after written notice of such default is provided by Landlord to Tenant, Landlord may take possession of Premises without further notice and without prejudice to Landlord's rights to damages.*
>
> Tenant shall be liable for all rent required to be paid per this Lease for the remainder of the Term as such amounts become due, subject to Landlord's obligation to make reasonably commercial efforts to relet the Premises. Such sums will be diminished by any net sums received by Landlord, if any, from the reletting of the Premises. However, if Landlord is unable to relet, using due diligence, Tenant will be liable for the full amount due.
>
> *Alternatively, Landlord may elect to cure any default and subsequent cost of such action shall be added to Tenant's financial obligations under this Lease.* Tenant shall pay all costs, damages and expenses suffered by Landlord by reason of Tenant's default(s), *subject to Landlord's duty to mitigate those costs, damages, and expenses.*

(Doc. No. 75, Ex. A, § 13) (emphasis added). If this section requires Dolmar to have provided Pulice with written notice and opportunity to cure their permitting violations discovered after Dolmar had repossessed the property, it is factually undisputed that Dolmar failed to do so, and thus Dolmar would be in breach.[10]

[10] Dolmar has moved to strike Pulice's argument regarding notice-and-cure as untimely. (Doc. No. 77). In its motion, Dolmar further argues that Section 13 did not impose a condition precedent to its recovery for breach under

Texas courts have meticulously interpreted a contract's meaning with the primary objective of ascertaining and giving effect to the parties' intent. *Bd. of Regents of Univ. of Tex. Sys., v. IDEXX Lab'ys, Inc.*, 691 S.W.3d 438, 432 (Tex. 2024) (quoting *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018)). Contractual language ought to "be read together so that none is rendered meaningless." *Id.* The fact that section 13 contains conditional language in one part does not necessarily make every other obligation in that section similarly conditional if the parties included language to the contrary. *See Arbor Windsor Ct., Ltd. v. Weekly Homes, LP*, 463 S.W.3d 131, 137 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). If the text of a contract is "subject to two or more reasonable interpretations, it is ambiguous." *Bd. of Regents*, 691 S.W.3d at 443 (quoting *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023)).

Pulice argues that the Court should interpret this section as collectively subject to the conditional notice-and-cure deadline. To read it any other way, Pulice contends, would yield bizarre results like allowing Dolmar to purchase a multi-million-dollar insurance policy and charging the premiums to Pulice if Pulice merely forgets to send to Dolmar the certificate of insurance. As such, it argues that although section 13 seemingly provides two alternative avenues to remedy the default, the notice-and-cure requirement should be applicable to both. Dolmar, on the other hand, argues that the notice-and-cure requirement applies only when the Landlord seeks to repossess the premises from the Tenant and not when, as here, it seeks damages for breach of contract. Thus, Dolmar claims that the notice-and-cure requirement is factually inapplicable as Pulice had already returned the property to Dolmar when Dolmar learned of the default. The parties' disagreement boils down to one question—whether the notice-and-cure requirement

the contract but merely created a covenant such that Pulice would still be liable for its alleged breach. As the Court is not granting summary judgment, these additional arguments are immaterial for the purposes of this order.

applies both to Dolmar's right to repossess the premises and its right to recover damages or only to the former.

The Lease states that if Pulice fails to cure within twenty days "after written notice of such default is provided by Landlord to Tenant, Landlord may take possession of Premises without further notice and without prejudice to Landlord's rights to damages." (Doc. No. 43, Ex. A, § 13). In the third paragraph of section 13, the Lease states, "[a]lternatively, Landlord may elect to cure any default and subsequent cost of such action shall be added to Tenant's financial obligation under this Lease . . . subject to Landlord's duty to mitigate those costs[.]" *Id.* The Lease therefore discusses Pulice's obligation to cure all financial obligations caused if Pulice failed to pay rent and Dolmar exercised its right to repossess. Following this discussion, the Lease uses use term "alternatively" to shift into discussion of Dolmar's right to elect to cure default and hold Pulice liable for costs incurred as a result. A reasonable jury could find that the notice-and-cure requirement from paragraph 1 similarly required Dolmar to provide notice and opportunity to cure before electing to cure and charge Pulice the cost pursuant to paragraph 3. A reasonable jury could also, however, find that the word "alternatively" here shows an intent on behalf of the parties to provide Dolmar with an *alternative* to the notice-and-cure requirement. This finding would be further supported by the fact that the third paragraph of section 13 provides its own conditions on Dolmar's exercise of this right by making it expressly subject to its duty to mitigate such damages.

Having found the language to be subject to two or more reasonable interpretations, the Court finds section 13 to be ambiguous. *See Bd. of Regents*, 691 S.W.3d at 443. Pulice presented this argument as a defense to Dolmar's motion for summary judgment. As the Court is denying Dolmar's motion generally, it need not rule on Pulice's defense of Dolmar's alleged failure to provide notice and opportunity to cure.

The Court, therefore, **DENIES** Dolmar's Motion for Partial Summary Judgment (Doc. No. 43).

## CONCLUSION

Based on the foregoing analysis, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. No. 43).

Signed on this 16th day of October, 2026.

Andrew S. Hanen
United States District Judge